**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| KENNETT SAARI, | : |
| Plaintiff, | :      Civil Action No. 15-3295 (MAS) (DEA) |
| v. | :      **MEMORANDUM OPINION** |
| THE MITRE CORPORATION, et al., | : |
| Defendants. | : |

**SHIPP, District Judge**

This matter comes before the Court on Defendants The MITRE Corporation ("MITRE"), Thomas Jensen ("Jensen"), and James Innskeep's ("Innskeep") (collectively, "Defendants") Motion for Summary Judgment. (ECF No. 18.) Plaintiff Kennett Saari ("Plaintiff") filed opposition (ECF No. 24) and Defendants replied (ECF No. 27). The Court has carefully considered the parties' submissions and decides the matter without oral argument pursuant to Local Civil Rule 78.1. For the reasons set forth below, Defendants' Motion for Summary Judgment is granted.

## I.    BACKGROUND

This matter arises out of the employment relationship between Plaintiff and MITRE. Plaintiff filed an eleven-count complaint on March 20, 2015, asserting claims under the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5-1, *et seq.*, the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2651(b) *et seq.*, and for breach of contract. (Notice of Removal, Compl., Ex. A, ECF No. 1-1.)

A.     **Undisputed Facts[1]**

MITRE "is a not-for-profit organization that operates research and development centers sponsored by the federal government." (Defs.' Statement of Undisputed Material Facts ("SUMF") ¶ 2, ECF No. 18-2.)[2] On October 15, 2007, Plaintiff began his employment with MITRE at its Eatontown, New Jersey location.  (*Id.* ¶ 6.) Plaintiff's employment with MITRE was at-will. (*Id.*) Plaintiff's "title was a level 4 simulation and modeling engineer" and he was assigned to support the U.S. Army. (*Id.* ¶¶ 8, 10.) "MITRE engineers can range from AC 2 (entry level) to AC 7 (highest level)." (*Id.* ¶ 11.)

When the closing of the Fort Monmouth Army Base impacted the work of MITRE employees assigned to support the U.S. Army, Plaintiff was offered a relocation package to Maryland. (*Id.* ¶¶ 13-14.) Plaintiff, however, declined the relocation package. (*Id.* ¶ 14.) In 2010,

---

[1] Local Civil Rule 56.1(a) permits a nonmoving party on summary judgment to provide "a supplemental statement of *disputed* material facts." (Emphasis added). Here, Plaintiff has filed a Counter-Statement of *Undisputed* Material Facts ("CSUMF"). (ECF No. 24-23.)  In deciding this Motion, the Court adopts the approach taken in *Mehr v. Atlantic City*:

> [T]he Local Rules do not contemplate a nonmoving party furnishing its own statement of undisputed material facts. Indeed, aside from not being contemplated by the local civil rules, such a document is not necessary to defeat summary judgment, as Plaintiffs must only show that some material fact is in dispute, and need not affirmatively prove their case at this point. However, as Defendants have fully responded to this "Counterstatement," and the Counterstatement helpfully cites to portions of the record, the Court sees no reason not to rely on the contents therein.

No. 12-4499, 2014 WL 4350546, at *3 n.3 (D.N.J. Sept. 2, 2014).

[2] For efficiency, the Court omits separate citations to Plaintiff's admissions to Defendants' SUMF (Pl.'s Resp. to Defs.' SUMF, ECF No. 24-22) where Plaintiff plainly "Admitted" without further elaboration.  Similarly, the Court omits citations to Defendants' Response to Plaintiff's Counter-Statement of Facts (Defs.' Resp. to Pl.'s CSUMF, ECF No. 27-1) where Defendants admit to Plaintiff's allegations. The Court further omits duplicative citation to both parties' statements of facts where the parties allege identical facts.

Plaintiff was transferred to a different position supporting the United States Department of Veterans Affairs (the "VA"). (*Id.* ¶ 23.) The new position was a "significant departure from his prior engineering work" and Plaintiff no longer performed modeling and simulation work. (*Id.* ¶¶ 16-17.)

In 2011, MITRE conducted an annual performance evaluation, known as the Performance and Development ("P&D") review, of its employees. (*Id.* ¶ 21.) The P&D review entailed a process called "laddering" in which every employee was individually ranked relative to his or her peers. (*Id.*) The laddering process took "into account [the employee's] impact, contributions and value to MITRE and its customers." (*Id.*) During the laddering process, employees were given a score of "1, 2, or 3" with "1" being the highest rating and "3" being the lowest. (*Id.* ¶¶ 21-22.) Since employees were ranked against each other, even employees with positive comments in their evaluations could nonetheless receive a low rating. (*Id.* ¶¶ 31-32.) The laddering system was put in place mainly to determine salary increases, and an employee that received a "3 rating did not receive a salary adjustment that year." (Pl.'s Resp. to Defs.' SUMF ¶ 39, ECF No. 24-22.) Prior to 2011, there was no laddering or rating system and the rating system ceased after the evaluations conducted in 2013. (Pl.'s Counter-Statement of Undisputed Material Facts ("CSUMF") ¶¶ 45, 55, ECF No. 24-23.)

Plaintiff's evaluations from 2007 through 2010, which did not contain a rating, did not note any deficiencies in Plaintiff's performance, and Plaintiff received positive feedback for his performance during that time period. (*Id.* ¶¶ 38-40, 45.) In his 2011 mid-year assessment, Plaintiff was given a positive review by his supervisor. (*Id.* ¶ 9.) Despite his 2011 mid-year performance review being characterized as "positive," Plaintiff received a "3" on his 2011 annual performance evaluation, signifying that he was in the bottom 10% of his peer group. (Defs.' SUMF ¶¶ 28-30.)

Because of the "3" rating, Plaintiff's salary remained the same and he did not receive a pay raise in 2011. (*Id.* ¶ 39.) The 2011 annual performance evaluation stated that Plaintiff "needed to engage the customer and be a thought-leader." (*Id.* ¶ 33.) The 2011 annual performance evaluation incorporated a self-evaluation made by Plaintiff during his mid-year review in which Plaintiff wrote a note that stated: "Although my long-term prognosis is 'good,' I expect to continue to have significantly limited eyesight for several more months due to recovery from multiple eye operations and procedures. I will likely need at least one more operation." (Pl.'s CSUMF ¶ 11.)

Supervisors Jeff Harrold ("Harrold") and Scott Walter ("Walter") provided feedback on Plaintiff's performance to Plaintiff's supervisor, Bill Burns ("Burns"), and the feedback was incorporated into Plaintiff's 2011 annual performance evaluation. (Defs.' SUMF ¶¶ 19, 36-37.) Innskeep, a high-level supervisor at MITRE, also participated in Plaintiff's 2011 laddering process and "reviewed the P&D and agreed with the assessment" of Plaintiff. (*Id.* ¶ 34.) Plaintiff received his 2011 annual performance evaluation in January 2012, and felt that he was being discriminated against because of his vision. (Defs.' SUMF ¶¶ 39-40, 42.) Plaintiff subsequently met with Harrold to discuss his 2011 annual performance evaluation. (*Id.* ¶ 40.) Plaintiff advised Harrold during this meeting that he disagreed with the "3" rating, especially because his mid-year evaluation had been positive. (*Id.* ¶¶ 40-41.) Plaintiff, however, does not recall reporting the alleged discrimination to Human Resources, despite having received discrimination training. (*Id.* ¶¶ 6, 43.)

Plaintiff also received a "3" rating on his 2012 performance evaluation, which he received in January 2013. (*Id.* ¶ 44.) Plaintiff again was ranked as the lowest employee of his peer group because his supervisor thought that Plaintiff was "not showing appropriate thought leadership within MITRE and with the customer." (*Id.* ¶¶ 44, 46.) Similar to the prior year, Plaintiff did not receive a pay raise in 2012. (*Id.* ¶ 47.) Plaintiff was disappointed with the 2012 annual performance

4

evaluation and met with Human Resources. (*Id.* ¶ 49.) Plaintiff, however, does not recall the specific content discussed during that meeting with Human Resources. (Pl.'s Resp. to Defs.' SUMF ¶ 49.)

During Plaintiff's time at the VA, MITRE's work grew substantially and the number of employees increased from four in 2010, when Plaintiff initially transferred to the VA, to 200 by 2012. (*Id.* ¶¶ 18, 25, 27.) In March 2013, however, MITRE decided to adjust its staffing levels by implementing a reduction-in-force ("RIF"). (Defs.' SUMF ¶ 52.) A total of 105 employees were included in the RIF, which included all employees that received a "3" rating on their 2012 annual performance evaluations. (*Id.* ¶¶ 53, 56.) The list of employees included in the RIF was finalized on March 25, 2013. (*Id.* ¶ 54.) The RIF was company-wide but only two employees impacted by the RIF were located in the New Jersey office. (Pl.'s CSUMF ¶ 52.) Jensen, Plaintiff's supervisor at the time, was unaware of the RIF until shortly before the RIF was announced on April 17, 2013. (Defs.' SUMF ¶ 54.) At the time MITRE announced the RIF, Plaintiff was on approved FMLA leave. (*Id.* ¶ 55.) On April 18, 2013, Plaintiff went into the office "to see what was going on" after hearing about the RIF from another employee. (*Id.*) On the same day and while on-site, Plaintiff was notified of the RIF. (*Id.*) Plaintiff was "shocked" to learn that he was included in the RIF and to receive correspondence regarding his termination from Jensen. (Pl.'s CSUMF ¶ 58.)

Plaintiff suffers from advanced keratoconus, a serious eye disease that impacts his vision, which is complicated with degeneration of the vitreous, floaters, and blurry vision. (*Id.* ¶¶ 3-5.) Burns and Jensen were aware that Plaintiff had vision problems. (*Id.* ¶ 19.) Because of his vision difficulties, Plaintiff had trouble working on his 22-inch monitor and sent an e-mail message to Ann Rugo ("Rugo"), a non-supervisor employee in MITRE's property department, on July 19, 2010, stating that: "I would greatly appreciate if you could swap out my 22-inch monitor with a

24-inch monitor. My current project requires much work on large spreadsheets, and with my vision difficulties, every inch of screen size counts." (Defs.' Resp. to Pl.'s CSUMF ¶ 24, ECF No. 24-22.) Within days, Plaintiff was provided with a 24-inch monitor and an additional 19-inch monitor. (*Id.*) Plaintiff spoke to Burns, his supervisor at the time, who offered his own larger monitor to Plaintiff when Plaintiff told him of his vision difficulties. (*Id.* ¶¶ 20-21.) Plaintiff, however, did not accept Burns's monitor as the resolution was too low for Plaintiff to use effectively. (*Id.*) Innskeep recalled Burns telling him that Plaintiff was receiving a new monitor. (Pl.'s CSUMF ¶ 22.) Innskeep, "who was based out of Virginia, only dealt with 'high level' issues and never had any interaction with [Plaintiff]." (*Id.* ¶ 22.) A request for a new computer monitor would require approval from a high level supervisor. (*Id.* ¶ 23.)

Plaintiff went on FMLA leave four times starting in August of 2010. (*Id.* ¶¶ 3, 7.) Plaintiff never provided anyone at MITRE with a doctor's note stating that he needed a larger monitor due to his vision problems. (Defs.' Resp. to Pl.'s CSUMF ¶¶ 3, 5.) Plaintiff knew that MITRE had a dedicated Human Resources representative at its New Jersey office that he could consult if needed. (Defs.' SUMF ¶ 7.) Plaintiff received anti-harassment/discrimination training while employed by MITRE. (*Id.* ¶ 6.) Plaintiff does not recall if he complained about his alleged disability when he spoke to Human Resources about his evaluation. (*Id.* ¶ 49.) Plaintiff, however, "firmly believed" that he had been discriminated against when he received a "3" rating on the 2011 annual performance rating in January 2012. (Pl.'s CSUMF ¶ 32.) Plaintiff filed his Complaint on March 20, 2015. (Defs.' SUMF ¶¶ 1, 57.)

### B.   Disputed Facts

Plaintiff asserts that he "performed his work at an exemplary level" both prior to and after the exacerbation of his disability, received positive feedback and awards and qualified for a "merit

transfer in 2010 as part of a select group to perform work for the" VA that was based upon his "capabilities, drive and dedication." (Pl.'s CSUMF ¶¶ 1-2, 9, 41-42, 47-48.) Defendants argue that Plaintiff's work was never "exemplary," any awards that Plaintiff won were given to all members of the team and did not reflect his personal contributions, a "merit transfer does not exist," and all four employees who applied to transfer to the VA were permitted to transfer. (Defs.' Resp. to Pl.'s CSUMF ¶¶ 1-2, 39, 41, 47-48.)

Defendants contend the RIF was in response to the possibility of a government sequestration, which would impact MITRE's resources. (Defs.' SUMF ¶¶ 51-52.) Plaintiff, however, denies this justification for the RIF and asserts that "the alleged reduction in force had nothing to do with revenue or funding" because MITRE was growing and hiring additional staff. (Pl.'s Resp. to Defs.' SUMF ¶¶ 51-53.)

Plaintiff alleges that after receiving his 2011 performance review, he complained to MITRE Human Resources Representative, Lisa Gold ("Gold"), informing her that he had been discriminated against. (Pl.'s CSUMF ¶ 32.) Plaintiff contends that Gold took no action with regard to his complaint. (*Id.* ¶ 33.) Defendants deny that Plaintiff complained about the alleged discrimination. (Defs.' Resp. to Pl.'s CSUMF ¶ 32.)

Plaintiff alleges that his doctor "has concluded that 'within a reasonable degree of medical certainty, [that Plaintiff] has a permanent disability related to his vision, [and] will have continuous disability with his [k]eratoconus and will require ongoing care.'" (Pl.'s CSUMF ¶ 6.) Defendants contend, however, that Plaintiff had "good vision" that was 20/25 to 20/30 in both eyes. (Defs.' Resp. to Pl.'s CSUMF ¶¶ 3, 6.) Defendants also contend that Plaintiff's doctor stated that Plaintiff was able to perform the functions of his position. (*Id.* ¶ 3.)

Plaintiff asserts that in April 2011, Ron Candrea ("Candrea"), one of Plaintiff's colleagues,

7

asked him to "assume full responsibility/leadership for an 'Operational/Readiness Testing (ORT)/Non-Functional Requirements (NFR)' project." (Pl.'s CSUMF ¶ 13.) Plaintiff asserts that he declined the leadership role "because he was struggling to view the information on the computer monitors that had been provided by MITRE." (*Id.* ¶ 14.) Plaintiff asserts that Candrea then informed Plaintiff's supervisors Jensen and Burns of his refusal. (*Id.* ¶¶ 15, 17.) Defendants, however, deny that Plaintiff was asked to take a leadership role on the project, and it was in fact Candrea who was the project leader. (Defs.' Resp. to Pl.'s CSUMF ¶¶ 13-14.) Defendants, therefore, argue that because Plaintiff was never asked to be the project leader, he never refused to be the leader and this refusal could not have been told to his supervisors. (*Id.* ¶¶ 15, 17.)

Plaintiff also asserts that "the positive attitude from MITRE towards him changed, and he was ultimately set up for termination, after he disclosed on his P&D that he would continue to have vision problems and would need another operation, and due to his requests for an accommodation." (Pl.'s CSUMF ¶¶ 12, 36.) Defendants allege that Plaintiff had received negative performance reviews regarding his lack of leadership as early as 2010, and his lack of leadership was the cause of his negative reviews. (Defs.' Resp. to Pl.'s CSUMF ¶ 36.)

Plaintiff alleges that after Jensen became his direct supervisor in 2012, Jensen exhibited "greater animosity" towards Plaintiff and told Plaintiff that he "had no confidence" in Plaintiff. (Pl.'s CSUMF ¶ 34.) Plaintiff alleges that this animosity stemmed from Plaintiff's "earlier requests for an accommodation of a larger, compatible computer monitor [] [, Plaintiff's] statement due to his disability and lack of the reasonable accommodation he requested from MITRE, [and] that he could not physically assume the leadership role that [] Jensen had requested." (*Id.* ¶ 35.)

Defendants deny that Jensen exhibited animosity towards Plaintiff and allege that Jensen "independently determined that [P]laintiff was not showing appropriate thought-leadership within

MITRE and with the customer." (Defs.' Resp. to Pl.'s CSUMF ¶ 34.) Plaintiff asserts that he was "set up for termination after he made [the disclosure regarding his vision] on his P&D[3] [and] that he would continue to have vision problems and would need another operation, and due to his requests for an accommodation." (Pl.'s CSUMF ¶ 12.) Defendants deny that Plaintiff's termination was based upon his alleged disability and assert that Plaintiff's termination was instead based upon his "3" rating on the 2012 annual performance evaluation. (Defs.' Resp. to Pl.'s CSUMF ¶ 12.) Defendants deny any change in attitude based upon Plaintiff's alleged disability as his 2011 mid-year review was positive, "which contradicts any alleged change in attitude or demeanor." (*Id.* ¶ 18.) Plaintiff alleges that he only received negative reviews after he disclosed that he would continue to have vision problems and require additional surgeries. (Pl.'s CSUMF ¶ 44.) Defendants assert, however, that Plaintiff received a positive mid-year review after his disclosure. (Defs.' Resp. to Pl.'s CSUMF ¶ 44.)

## II.   **LEGAL STANDARD**

Summary judgment is appropriate if the record shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. A material fact raises a "genuine" dispute "if the evidence is such that a reasonable jury could return a verdict for the non[-]moving party." *Williams v. Borough of W. Chester*, 891 F.2d 458, 459 (3d Cir. 1989) (quoting *Anderson*, 477 U.S. at 250).

---

[3] The Court notes that Plaintiff's disclosure initially occurred during his 2011 mid-year review (Pl.'s CSUMF ¶ 11), and was incorporated into Plaintiff's 2011 annual performance evaluation (Defs.' SUMF ¶¶ 19, 36-37).

In evaluating the evidence, the Court must consider all facts and their logical inferences in the light most favorable to the non-moving party. *Curley v. Klem*, 298 F.3d 271, 276-77 (3d Cir. 2002). While the moving party bears the initial burden of proving the absence of a genuine dispute of material fact, meeting this obligation shifts the burden to the non-moving party to "set forth specific facts showing that there is a genuine [dispute] for trial." *Anderson*, 447 U.S. at 250. If the non-moving party fails to:

> make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial[,] . . . . there can be "no genuine [dispute] of material fact," [because] a complete failure of proof concerning an essential element of the non[-]moving party's case necessarily renders all other facts immaterial.

*Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 n.5 (3d Cir. 1992) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

## III.   PARTIES' POSITIONS

### A.   NJLAD Disability Discrimination (Count One)

Plaintiff seeks recovery for disability discrimination under the NJLAD. N.J.S.A. § 10:5-1. Defendants argue that in February 2013, MITRE became concerned that a government sequestration might occur and MITRE decided to adjust its staffing levels by implementing a RIF which included every employee who received a performance rating of "3" on the 2012 annual performance evaluations. (Defs.' Reply Br. 7, ECF No. 27.) Based on this criterion, "over 100 employees company-wide were affected, including two in New Jersey." (*Id.*) Defendants argue that Plaintiff was included in the RIF because of a non-discriminatory reason, namely his poor work performance, and Plaintiff has presented no evidence of pretext since the poor evaluation was completed before the decision to implement the RIF was finalized. (Defs.' Moving Br. 25, ECF No. 18-1; Defs.' Reply Br. 7.)

Plaintiff argues that he was terminated due to his disability and not because of the RIF. (Pl.'s Opp'n Br. 8.) Plaintiff alleges that he has established a prima facie claim for discrimination as: (1) Plaintiff's vision difficulties placed him in a protected class; (2) Plaintiff was qualified for his position; and (3) Plaintiff was terminated and replaced by another employee. (*Id.* at 9-13.) Plaintiff argues that he is disabled under the NJLAD because "blurriness in the eyes, or floaters in the eyes, or black spots" are considered a disability under the NJLAD. (*Id.* at 10 (quoting *Meyers v. Bd. of Educ.*, No. 07-5058, 2010 WL 4387503, at *7 (D.N.J. Oct. 29, 2010)).)

Plaintiff further alleges that he was qualified for his position because he "consistently received awards and recognition for his performance prior to his discharge." (*Id.* at 10-11.) Plaintiff also alleges that the negative performance ratings in 2011 and 2012 were "based not upon [his] ability to perform [his] work but upon [his] performance against [his] peers" because MITRE required supervisors to rank employees in a laddering system. (*Id.* at 12.) In addition, Plaintiff alleges that he was replaced by another staff member and additional individuals were recruited as MITRE was growing at the time of his termination. (*Id.* at 13.)

Plaintiff argues that he has demonstrated a prima facie case of discrimination. (*Id.* at 13.) Plaintiff additionally argues that Defendants fail to satisfy their burden of demonstrating a non-discriminatory reason for his termination because Plaintiff was one of only two employees in New Jersey terminated in the RIF, and that the RIF was not necessary as the amount of work for the business continued to grow. (*Id.* at 14-15, 20-21.) Plaintiff contends that Defendants' stated reason for his termination, namely a mass reduction in workforce, was a pretext for discrimination. (*Id.* at 15.) Plaintiff, therefore, argues that there are "inconsistencies, contradictions, and implausibilities in Defendants' contentions that the RIF was conducted for economic reasons." (*Id.* at 20.)

Plaintiff also alleges that Defendants' statements that he was a poor performer and that the RIF was an economic necessity demonstrate pretext on the part of Defendants. (*Id.* at 14-15.) Plaintiff alleges that he received compliments and awards for his performance and that the poor performance rating was inconsistent with Defendants' previous statements. (*Id.* at 16-17.) Plaintiff also alleges that he was terminated because of his request for accommodation for his visual impairments. (*Id.* at 17.) Plaintiff alleges that Innskeep gave instructions to change the language in Plaintiff's performance review in order to make the evaluation more critical. (*Id.* at 18.) Plaintiff further alleges that despite Jensen's praise of Plaintiff during the 2011 mid-year performance review, Jensen gave Plaintiff a negative performance review in response to Plaintiff's request for accommodation. (*Id.* at 19.)

Defendants argue that Plaintiff has failed to cite to any evidence that any supervisor who gave Plaintiff a negative review knew the RIF would occur, or to any evidence that MITRE did not use neutral criteria to determine who was included in the RIF. (Defs.' Reply Br. 8.) As such, Defendants argue that Plaintiff's claim should be dismissed as a matter of law as Plaintiff has not demonstrated pretext by Defendants. (*Id.*) Defendants further argue that the positive statements about Plaintiff's performance upon which Plaintiff relies are irrelevant and/or relate to work that Plaintiff performed years ago. (*Id.* at 20-23.) Defendants contend that Plaintiff's allegation that Innskeep told Plaintiff's supervisor to change Plaintiff's evaluation from positive to negative is "sheer speculation" and that no evidence has been offered that it is true. (*Id.* at 23.) Defendants also argue that Plaintiff is misrepresenting testimony as Plaintiff testified that he did not recall reporting unlawful behavior to Human Resources, yet he argues in his brief that he did so. (*Id.* at 24 (citing Pl.'s Opp'n Br. 25, 45).)

**B.     Statute of Limitations: Failure to Accommodate (Count Two), Hostile Work Environment (Count Three), Retaliation (Count Four), Aiding and Abetting (Count Five)**

Defendants argue that "Plaintiff's alleged eye disability discrimination claims, which allegedly triggered his poor performance evaluations issued in January of 2012 and January of 2013, are barred." (Defs.' Moving Br. 3.) Specifically, Defendants argue that "[P]laintiff testified at his deposition that, as of January 2012, [Plaintiff] believed his 2011 negative evaluation was the result of alleged discrimination." (*Id.*) As such, Defendants contend that a two-year statute of limitations period governs. (*Id.* at 20 (citing *Montells v. Haynes*, 627 A.2d 654, 659 (N.J. 1993)).)

Defendants argue that the continuing violation theory is not applicable in this matter as the alleged discriminatory conduct took place years before the performance evaluations and the performance evaluations were discrete acts that do not extend the statute of limitations under the continuing violation theory. (*Id.* at 21-22 (citing *Kuilan v. Sodexo Inc.*, No. 11-4567, 2012 WL 1964492, at *3-4 (D.N.J. May 31, 2012)).) Defendants allege that since Plaintiff's salary was frozen by the negative reviews in 2012 and 2013 and Plaintiff believed that the 2011 and 2012 reviews were based upon discrimination, the evaluations were discrete acts that accrued on the date the acts occurred and did not stop the tolling of the statute of limitations. (*Id.* at 20-23 (citing *Sgro v. Bloomberg L.P.*, No. 05-731, 2008 WL 918491, at *6 (D.N.J. Mar. 31, 2008)).) Defendants argue that because Plaintiff did not file his Complaint until March 20, 2015, "over three years after receiving his '3' rating" on the January 2012 and January 2013 performance reviews, Counts Two through Five are time barred by the two-year statute of limitations. (*Id.* at 21.)

Plaintiff argues that the claims are not barred by the statute of limitations as tolling did not begin to run until Plaintiff's termination. (Pl.'s Opp'n Br. 4.) Plaintiff argues that Defendants' arguments are based upon an unreported case, *Kuilan*, which is not binding on the Court. (*Id.* at 5 (citing 2012 WL 1964492, at *3-4).) Plaintiff also argues that *Kuilan* and several other cases hold

that the statute of limitations accrues from the date of discharge.  (*Id.* at 5-6 (citing 2012 WL 1964492, at \*3-4; *Henry v. N.J. Dep't of Human Servs.*, 9 A.3d 882, 890 (N.J. 2010); *Keelan v. Bell Commc'ns Research*, 674 A.2d 603 (N.J. Super. Ct. App. Div. 1996)).)

Plaintiff argues that because his claim is based on a continuing series of harassment from 2012 to 2013, the statute of limitations does not begin to run until his April 18, 2013 termination. (*Id.* at 7-8 (citing *Wilson v. Wal-Mart*, 729 A.2d 1006, 1011 (N.J. 2009)).) Plaintiff, therefore, argues that his Complaint, which was filed on March 20, 2015, is not time barred. (*Id.*)

### C.    NJLAD Claims (Counts, Two, Three, Four, Five)

#### 1.    Failure to Accommodate (Count Two)

Defendants argue that Plaintiff's alleged visual impairment, keratoconus, is not a recognized disability under the ADA. (Defs.' Moving Br. 30-31.) Defendants argue that, in addition to keratoconus, Plaintiff had floaters in his vision and was farsighted, which are both common within the general public. (*Id.* at 31.) Defendants, therefore, argue that Plaintiff was not disabled under the ADA. (*Id.*)

Defendants argue that Plaintiff "failed to articulate a reasonable accommodations request by not sufficiently engaging in the interactive process at MITRE." (*Id.* at 32.) Defendants argue that Plaintiff requested a larger monitor on July 19, 2010 and was given a larger 24 inch monitor within two days and an additional monitor on the third day. (*Id.*) Defendants contend that Plaintiff's request for accommodations was granted and that there is no record of Plaintiff submitting other requests. (*Id.* at 33.)

With respect to Plaintiff's allegation that he made additional verbal requests to his supervisors for a larger monitor, Defendants argue that one supervisor, Burns, offered Plaintiff his monitor and another supervisor referred Plaintiff to Rugo, an employee in the property department.

(*Id.* at 33-34.) Rugo provided Plaintiff with a 24 inch monitor in response to his request but stated that she was not authorized to purchase additional equipment. (*Id.* at 34.) Defendants argue that Plaintiff took no further steps such as submitting the request in writing or contacting Human Resources or Health Services to notify his employer of his alleged need for an even larger monitor. (*Id.*) Defendants argue that Plaintiff had an obligation to explain why his 24 inch monitor was not sufficient so that Defendants could evaluate his alleged disability and the reasonableness of his request. (*Id.* at 35-36.) Defendants contend that Plaintiff has failed to demonstrate that he had a disability that required a larger monitor or that he made a request after Rugo told him that she could not purchase additional monitors. (*Id.* at 36.) Defendants submit that because Plaintiff cannot demonstrate that he was disabled when he made the request, his claim must fail. (*Id.* at 37-38 (citing *Victor v. State*, 4 A.3d 126, 149 (N.J. 2010)).)

Plaintiff acknowledges the failure to accommodate standard and argues that he satisfied all four factors. In addition, Plaintiff argues that there is a genuine dispute of material fact as to whether his condition, keratoconus, is a disability and, therefore, summary judgment is not appropriate. (Pl.'s Opp'n Br. 29 (citing *Celotex Corp.*, 477 U.S. at 323).) Plaintiff asserts that his treating ophthalmologist found that Plaintiff has a "permanent disability related to his vision as defined by New Jersey law[.]" (*Id.* at 31.) Accordingly, Plaintiff argues that he "has established a physical disability under the NJLAD." (*Id.* (citing *Meyers*, 2010 WL 4387503, at \*19).)

Plaintiff asserts that he made numerous requests for accommodations: verbally and in writing to supervisors, Burns and Jensen; and verbally to his supervisor, Harrold. (*Id.* at 32.) Plaintiff argues that despite having more than 6000 employees and dozens of work sites, MITRE would not accommodate Plaintiff's request for a larger monitor. (*Id.* at 32-33.) Plaintiff further asserts that the only conversation that Innskeep even recalled having about Plaintiff concerned

Plaintiff's request for a new monitor. (*Id.* at 33.) Plaintiff also contends that he advised his supervisors of his continuing vision problems in his self-evaluation. (*Id.*)

Plaintiff states that the monitor offered by Burns had such low resolution that it was similar to the resolution of a television screen. (*Id.* at 34.) Plaintiff argues that the larger monitor provided by Rugo was not large enough to reasonably accommodate him. (*Id.*) Plaintiff further argues that he informed Rugo of this fact and she told him that she was not authorized to purchase additional equipment. (*Id.* at 34-35.) Plaintiff asserts that when he renewed the accommodations request, his supervisor again directed Plaintiff to speak with Rugo who had already stated that she was unable to help him. (*Id.* at 35.) Plaintiff argues that because there is a dispute of material fact as to whether Plaintiff requested accommodations, summary judgment is inappropriate and the matter must go to the jury. (*Id.* at 35-36.)

Plaintiff argues that there is a dispute of material fact as to whether Defendants made a good faith effort to accommodate Plaintiff's disability. (*Id.* at 36.) Plaintiff also argues that providing him with a slightly larger monitor was not a sufficient accommodation. (*Id.*) Plaintiff argues that when an employer "makes no effort to help [an employee] find accommodations and is responsible for the breakdown in the process" summary judgment is not appropriate. (*Id.* at 37 (quoting *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 317-18 (3d Cir. 1999)).) Plaintiff argues that a reasonable jury could "conclude that MITRE's lack of effort to accommodate [Plaintiff] was the reason for the alleged breakdown in the interactive process and there were reasonable accommodations through the purchase of a larger monitor with resolution suitable to accommodate [Plaintiff's] visual impairment." (*Id.* at 37-38.) Plaintiff further alleges that his request for accommodations could have been reasonably accommodated but for a lack of good faith by MITRE. (*Id.* at 38.) Plaintiff argues that *Victor*, the case Defendants rely upon, is distinguishable

because, unlike the plaintiff in *Victor* who was not disabled at the time he requested accommodations, Plaintiff was disabled when he made the request for accommodations. (*Id.* (citing *Victor*, 4 A.3d at 126).)

In their Reply, Defendants argue that *Meyers* does not specifically state that Plaintiff's condition, keratoconus, is a disability. (Defs.' Reply Br. 13 (citing *Meyers*, 2010 WL 4387503, at *7).) Rather, Defendants contend that "in *Meyers*, the plaintiff was alleging an eye condition in which he suffered blurriness and black spots," but that there "is no specific mention of [k]eratoconus and no NJLAD case specifically addresses [k]eratoconus." (*Id.*) Defendants argue that Plaintiff's doctor stated that aside from being required to take occasional leave, Plaintiff could perform the functions of his position and that Plaintiff's vision was "very good." (*Id.* at 13-14.) Defendants further argue that Plaintiff's doctor is prohibited from testifying to a legal conclusion, namely that Plaintiff has a disability as defined by law. (*Id.* at 14.) Moreover, Defendants argue that unlike the plaintiff in *Victor*, Plaintiff "had a number of accommodation options that he did not utilize." (*Id.* at 17 (citing *Victor*, 4 A.3d at 126).)

### 2.   Hostile Work Environment (Count Three)

Defendants argue that Plaintiff's hostile work environment claim must fail as Plaintiff has failed to produce any communications showing hostility towards Plaintiff based on his vision problems. (Defs.' Moving Br. 40.) Defendants further allege that none of the other alleged incidents of hostility were severe or pervasive. (*Id.* (citing *Lehmann v. Toys 'R' Us, Inc.*, 626 A.2d 445, 448 (N.J. 1993)).) Defendants contend that Plaintiff never complained about a hostile work environment, despite having training that provided instruction on how to file a complaint. (*Id.* at 40-41.)

Plaintiff argues that his claim for a hostile work environment survives summary judgment. (Pl.'s Opp'n Br. 39.) Plaintiff alleges that "Defendants repeatedly and intentionally, refused to accommodate Plaintiff's disability, subjected him to severe and pervasive conduct due to his disability, and utilized his disability as a basis for his termination." (*Id.* at 40.) Plaintiff argues that the "intentional and retaliatory alterations" of his reviews, baseless criticism, and false appraisals upon which his termination was based would not have occurred if not for his disability. (*Id.* at 41-42.) Plaintiff, therefore, contends that this creates a genuine dispute of material fact as to whether the conduct was severe or pervasive enough that a reasonable person could believe that his working condition had become altered and his working environment hostile. (*Id.* at 42.)

### 3.   Retaliation (Count Four)

Defendants argue that Plaintiff cannot establish a prima facie case for retaliation because Plaintiff did not engage in a protected activity and that there was no causal link between the alleged protected activity and the negative employment action. (Defs.' Moving Br. 41-42.) According to Defendants, Plaintiff alleges two protected activities: (1) refusing to take the leadership role in a project offered by Candrea because of his vision; and (2) requesting a larger monitor. (*Id.* at 43-44.) Defendants argue that neither of these are protected activities. (*Id.*) Defendants allege that Candrea never requested that Plaintiff serve as lead on the project. (*Id.* at 44.) Defendants also argue that there was no causal connection between Plaintiff's alleged refusal to lead the project and his negative performance reviews because Jensen, the person to whom Candrea allegedly complained about Plaintiff's refusal, had no input on Plaintiff's performance review because he was not Plaintiff's supervisor at the time of the alleged protected activity. (*Id.* at 43.)

Defendants additionally argue that Plaintiff requested the monitor 18 months before Jensen became his supervisor and there was no documentation that Plaintiff requested additional

accommodations from Jensen. (*Id.* at 45.) Defendants, therefore, contend that there is no causal connection between a request for a larger monitor and Plaintiff's poor performance reviews. (*Id.*) Defendants argue that Plaintiff received negative performance reviews from multiple supervisors over a two-year period, which demonstrates that it was Plaintiff's poor performance, and not retaliation for requesting a monitor, that caused Plaintiff to receive "3" ratings on his 2011 and 2012 annual performance evaluations. (*Id.* at 45-46.) Defendants contend that there was no pretextual plan to discharge Plaintiff by giving him negative performance reviews, asserting that the 2012 annual performance evaluations were finalized in January of 2013 and the RIF occurred in April of the same year. (*Id.* at 46.)

Plaintiff alleges that his NJLAD retaliation claim should survive summary judgment. (*Id.*) Plaintiff asserts that that he does not need to prevail on the merits of his claim, but "simply establish that he was acting under a good faith and reasonable belief that his right to be free from discrimination on the basis of his disability was violated." (*Id.* (citing *Carmona v. Resorts Int'l Hotel, Inc.*, 915 A.2d 518, 530 (N.J. 2007)).) Plaintiff asserts that he notified Human Resources that he felt that his poor performance review was connected to his disability. (*Id.* at 46-47.) Plaintiff alleges that after his complaint to Human Resources, his supervisors became increasingly hostile towards him, gave him undeserved poor ratings, ignored positive feedback about Plaintiff, and terminated Plaintiff's employment. (*Id.* at 47.)

### 4.    Aiding and Abetting (Count Five)

Defendants assert that Plaintiff offered no evidence that Jensen assisted with any discrimination against Plaintiff based on Plaintiff's vision. (Defs.' Moving Br. 47.) Defendants argue that the facts against Innskeep do not support a claim for aiding and abetting because Innskeep had no direct contact with Plaintiff, he was not aware that Plaintiff allegedly refused the

lead on a project due to vision issues, he did not object to Plaintiff receiving an additional monitor, and when he concurred with the negative evaluation in 2011, Innskeep was not aware that an RIF would occur in 2013. (*Id.* at 47-49.)

Plaintiff argues that his aiding and abetting claims should survive summary judgment because his supervisors were "active participants in the harsh and offensive treatment he endured." (Pl.'s Opp'n Br. 47.) Plaintiff alleges that he informed his supervisors of his disability and they advised Innskeep of Plaintiff's disability. (*Id.*) Plaintiff argues that, after his supervisors were informed of his disability, his supervisors, particularly Jensen, began a "calculated effort" to "create a pre-textual document trail that would form the basis of a low performance rating and eventually termination." (*Id.*) Plaintiff also argues that Defendants incorrectly rely upon *Tarr*. (*Id.* at 48 (citing *Tarr v. Ciasulli*, 853 A.2d 921, 929 (2004)).)

With respect to the aiding and abetting standard, Plaintiff alleges that Jensen and Innskeep "were directly involved through their decisions and comments in denying Plaintiff reasonable accommodations and [in making] disparaging comments about [Plaintiff's] condition." (*Id.*) Plaintiff alleges that even though Innskeep did not have direct contact with Plaintiff, Innskeep knowingly denied his request for accommodations and "as a primary decisionmaker . . . was an active participant in Defendant[s'] scheme to create a hostile and discriminatory work environment." (*Id.* at 49.)

Plaintiff similarly argues that Jensen knowingly assisted in Defendants' discriminatory conduct. (*Id.*) Plaintiff contends that, despite his positive performance reviews, Jensen told Plaintiff that he had "no confidence" in Plaintiff and exhibited animosity towards him. (*Id.*) In addition, Plaintiff asserts that these actions were based solely upon Plaintiff's condition and Plaintiff's request for accommodations. (*Id.*) Plaintiff, therefore, argues that Jensen and Innskeep's

knowing and wrongful actions were instrumental in creating a hostile and discriminatory environment for Plaintiff and that Jensen and Innskeep were aware of their role in creating this environment. (*Id.* at 50.)

Defendants reply that Jensen's negative review in 2012 was consistent with Plaintiff's previous supervisor's review in 2011. (Defs.' Reply Br. 18.) Defendants further assert that, at the time of Plaintiff's performance evaluation, Jensen was unaware that the evaluation would be utilized in the selection of candidates who would be included in the RIF. (*Id.*) Defendants assert that Innskeep had no personal interactions with Plaintiff and that Innskeep only concurred with Plaintiff's 2011 annual performance evaluation. (*Id.*) Defendants allege that there is no causal connection between the 2011 annual performance evaluation and his RIF-based termination. (*Id.*)

### D.   Family Medical Leave Act (FMLA) Claims (Counts Six, Seven, Eight)

Plaintiff alleges that "Defendants intentionally terminated Plaintiff in a manner that Defendants believed would deprive Plaintiff the protections of the FMLA and/or interfere with Plaintiff taking FMLA leave." (Compl. ¶ 81.)

Defendants argue that Plaintiff's FMLA claims fail as a matter of law, as an employee may be terminated while on FMLA leave if the termination would have occurred if the employee was at work. (Defs.' Moving Br. 26-27 (citing *Wolpert v. Abbott Labs.*, 817 F. Supp. 2d 424, 438 (D.N.J. 2011)).) Defendants argue that Plaintiff would have been included in the RIF if he had been at work and not on FMLA leave, asserting that the RIF included all employees who had received a rating of "3" during their 2012 annual performance reviews. (*Id.* at 27.) In addition, Defendants argue that because Plaintiff returned to work on his own initiative when he learned of the RIF from a co-worker, there was nothing unlawful about advising him of his layoff pursuant to the RIF. (*Id.*)

21

Plaintiff argues that his inclusion in the RIF was based upon mixed motives, namely "discriminatory animus that was causally linked to his disability . . . and FMLA leave" and a non-discriminatory desire to reduce the workforce. (Pl.'s Opp'n Br. 21-22.) Plaintiff argues that he can demonstrate substantial reliance on a discriminatory factor because "the conduct of the decision makers at MITRE, namely Candrea, Jenson, and Innskeep, reflected a discriminatory attitude towards Plaintiff." (*Id.* at 23.) Plaintiff argues that, prior to an increase in symptoms of his keratoconus, he always received positive performance reviews. (*Id.*) Plaintiff argues, however, that he was treated differently after he took FMLA leave and requested accommodations for his disability. (*Id.*)

Plaintiff argues that the difference in the positive feedback and his negative ratings was based upon discriminatory animus. (*Id.* at 26.) Plaintiff further argues that Defendants have failed to offer any reason besides his laddered score for Plaintiff's termination. (*Id.* at 27.) Plaintiff argues that his low rating stems from a discriminatory reason, and Defendants are unable to offer any non-discriminatory reason for Plaintiff's termination. (*Id.* at 27-28.) Plaintiff, therefore, argues that his FMLA claim should survive summary judgment. (*Id.* at 42.)

With respect to the first prong, Plaintiff alleges that he engaged in a protected activity by taking FMLA leave, seeking accommodations, and complaining about his performance reviews. (*Id.* at 43.) Plaintiff asserts that the second prong is satisfied by the hostile work environment he endured and his termination. (*Id.*) Plaintiff alleges that the final prong is satisfied by "the temporal connection between his protected activity and [the] adverse employment decision." (*Id.* (citing *Weiss*, 747 F. Supp. 1118, 1129 (D.N.J. 1990)).)

Plaintiff further alleges that his claim for retaliation under the FMLA should also survive summary judgment. (*Id.*) Plaintiff alleges that under the FMLA, he must satisfy his burden under

22

*Weiss* and additionally demonstrate that he suffered an adverse employment action that "'might well have dissuaded a reasonable worker' from exercising a right under the FMLA." (*Id.* at 43-44 (quoting *Berridge v. Nalco Co.*, No. 10-3219, 2014 WL 340596, at *7 (D.N.J. Jan. 30, 2014)).) In support of this claim, Plaintiff contends he suffered retaliation when: (1) he suffered adverse employment actions when he received negative undeserved performance evaluations; (2) his positive performance review was modified to be more negative; and (3) his supervisor stated that he had "no confidence" in Plaintiff even though Plaintiff was performing appropriately. (*Id.* at 45.)

Defendants reply that Plaintiff's mixed motive analysis is misplaced. (Defs.' Reply Br. 9.) Defendants contend that Plaintiff was only evaluated on his performance as compared to all other employees. (*Id.*)

### E.   Contract Claims (Counts Nine Ten, Eleven)

Defendants argue that all of Plaintiff's contract claims fail because he was an at-will employee. (Defs.' Moving Br. 4, 28-29.)

## IV.   DISCUSSION

### A.   NJLAD Disability Discrimination (Count One)

"When a plaintiff seeks to prove a claim of employment discrimination under the NJLAD in the absence of direct evidence of discrimination, New Jersey and Federal Courts analyze the claim under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Wolpert*, 817 F. Supp. 2d at 433. "All [NJ]LAD claims are evaluated in accordance with the United States Supreme Court's burden-shifting mechanism." *Battaglia v. United Parcel Serv., Inc.*, 70 A.3d 602, 619 (N.J. 2013) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-804 (1973)). Under this framework, a plaintiff must first establish "a prima facie case of discrimination or retaliation." *Tourtellotte v. Eli Lilly & Co.*, 636 F. App'x 831, 842 (3d Cir. 2016). Following a prima facie showing, the burden shifts to the employer "to articulate a legitimate,

nonretaliatory or nondiscriminatory reason for its actions." *Id.* The employer's burden to "articulate some legitimate, nondiscriminatory reason" is "relatively light." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). "If the employer produces such [a legitimate, nondiscriminatory] reason, the burden then shifts back to the plaintiff to prove that the employer's nonretaliatory or nondiscriminatory explanation is merely a pretext for the discrimination or retaliation." *Tourtellotte*, 636 F. App'x at 842 (citing *McDonnell Douglas Corp.*, 411 U.S. at 802-04).

To establish a prima facie case of discrimination, "a plaintiff must first establish that: (1) [he] is a member of a protected class; (2) [he] was qualified for the position in question; (3) [he] suffered an adverse employment action; and (4) that adverse employment action gives rise to an inference of unlawful discrimination." *Id.* (citing *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410-11 (3d Cir. 1999)). "To constitute an adverse employment action, the action must be 'serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment.'" *Id.* (quoting *Cardenas v. Massey*, 269 F.3d 251, 263 (3d Cir. 2001)). Finally, "an adverse employment action must be material" to satisfy the prima facie showing. *Id.* (citing *Cardenas*, 269 F.3d at 263).

To show pretext under the *McDonnell Douglas* framework, a plaintiff "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Id.* (quoting *Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006)). To do so, a plaintiff "must 'demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for [the

asserted] nondiscriminatory reasons.'" *Id.* (alteration in original) (quoting *Tomasso*, 445 F.3d at 706).

The Court finds that Plaintiff fails to demonstrate a prima facie case of discrimination. *See id.* Assuming *arguendo* that Plaintiff was able make a prima facie showing of discrimination, the Court finds that Defendants have satisfied their burden by "articulat[ing] some legitimate, nondiscriminatory reason" for Plaintiff's termination and inclusion in the RIF. *See Fuentes*, 32 F.3d at 763. MITRE instituted a RIF in response to funding and staffing considerations. (*See* Defs.' Reply Br. 7; Defs.' Moving Br., Ex. 2, at Jensen Dep. 165:3-8, ECF No. 18-5.) All of the 105 employees included in the RIF received "3" ratings on their 2012 annual performance evaluations. (Defs.' SUMF ¶¶ 53, 56.) Moreover, Jensen, one the supervisors who completed Plaintiff's 2011 and 2012 annual performance evaluations, was not aware of the RIF at the time Plaintiff received the "3" ratings and was not aware of Plaintiff's inclusion in the RIF until shortly before the RIF was announced on April 17, 2013. (Defs.' SUMF ¶ 54.) Since Defendants proffered a legitimate, nondiscriminatory reason for its action, the burden would then shift back to Plaintiff. The Court concludes that Plaintiff fails meet this burden because he did not demonstrate that MITRE's legitimate, nondiscriminatory reasons were pretextual under the *McDonnell Douglas* framework. *See Tourtellotte*, 636 F. App'x at 842 (citation omitted). The Court, therefore, finds that under the *McDonnell Douglas* framework, Defendants have satisfied their burden of introducing evidence that would permit a reasonable factfinder to conclude that there was a legitimate, nondiscriminatory reason for the unfavorable employment decision. *See Fuentes*, 32 F.3d at 763.

The record does not permit the Court to conclude that Defendants' decision to terminate Plaintiff was a result of discriminatory animus. Here, Plaintiff has not met his burden. First, the Court finds there is no evidence in the record from which a reasonable factfinder could find that

Plaintiff's termination was based on any factor other than his low performance review score. Over 100 employees were included in the RIF and all received a "3" on their respective 2012 annual performance evaluations. (Defs.' SUMF ¶¶ 53, 56.) It strains the bounds of credibility to believe that MITRE would terminate 104 employees simply to invent a defense for a hypothetical lawsuit that Plaintiff might file in the future. Thus, the record does not include any evidence from which a rational factfinder could reasonably conclude that Plaintiff was terminated in the RIF due to discrimination. The Court, therefore, grants Defendants' Motion for Summary Judgment as to Count One.

> **B.**     **Statute of Limitations on Failure to Accommodate (Count Two), Hostile Work Environment (Count Three), Retaliation (Count Four), Aiding and Abetting (Count Five)**

Plaintiff asserts vision disability discrimination claims under the NJLAD, including claims for failure to accommodate, hostile work environment, retaliation, and aiding and abetting. (Compl. ¶¶ 46-78.) There is a two-year statute of limitations for all claims alleging a violation of the NJLAD. *Montells*, 627 A.2d at 659. "The exception to the statute of limitations is the 'continuing violation theory,' which applies '[w]hen an individual is subject to a continual, cumulative pattern of tortious conduct.'" *Kuilan*, 2012 WL 1964492, at *3 (quoting *Wilson*, 729 A.2d at 1010). "When an individual is subject to a continual, cumulative pattern of tortious conduct, the statute of limitations does not begin to run until the wrongful action ceases." *Wilson*, 729 A.2d at 1010.

The Third Circuit has recognized that a statute of limitations may be extended based upon the continuing violation doctrine if the last act of a continuing practice of unlawful acts falls within the statute of limitations. *West v. Phila. Elec. Co.*, 45 F.3d 744, 754 (3d Cir. 1995); *see also Cowell v. Palmer Twp.*, 263 F.3d 286, 292 (3d Cir. 2001). In order to benefit from the continuing violation

doctrine, "a plaintiff must establish that the defendant's conduct is 'more than the occurrence of isolated or sporadic acts.'" *Cowell*, 263 F.3d at 292 (quoting *West*, 45 F.3d at 755). If the plaintiff's claims are based on discrete acts which give rise to causes of action that can be brought individually, then the continuing violation doctrine does not serve to extend the applicable statute of limitations periods. *O'Connor v. City of Newark*, 440 F.3d 125, 128 (3d Cir. 2006). In other words, the continuing violation doctrine is inapplicable where a claim is based on discrete acts which can include termination, failure to promote, denial of transfer, refusal to hire, wrongful suspension, wrongful discipline, denial of training, or wrongful accusation. *Id.* at 127 (citing *Nat'l R. R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002)).

The Court finds that Defendants' alleged discriminatory conduct does not constitute a "continual, cumulative pattern of tortious conduct[.]" *Wilson*, 729 A.2d at 1010. Rather, the Court finds that the discrete acts complained of occurred in 2011 and 2012. Plaintiff, however, did not file his Complaint until March 20, 2015, which is over three years after receiving his 2011 performance rating and more than two years after receiving his 2012 performance rating in January 2013. (*See* Defs.' SUMF ¶¶ 1, 29, 44.) As a result, the Court concludes that Counts Two, Three, Four, and Five are barred by the statute of limitations. Accordingly, the Court grants Defendants' Motion for Summary Judgment as to these Counts.

### C.      Family Medical Leave Act (FMLA) Claims (Counts Six, Seven, Eight)

The FMLA provides eligible employees with up to twelve weeks of protected leave "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). The statute requires that an employee taking qualified leave is restored to "the position of employment held by the employee when the leave commenced; or . . . an equivalent position with equivalent employment benefits,

27

pay, and other terms and conditions of employment." 29 U.S.C. §§ 2614(a)(1)(A), (B). Under the

statute, an aggrieved plaintiff can seek recovery under a retaliation or an entitlement theory.

*Santosuosso v. NovaCare Rehab.*, 462 F. Supp. 2d 590, 596-97 (D.N.J. 2016).

      1.     Violation of FMLA (Count Six – Mixed Motive)

With respect to Count Six, a claim asserting this type of argument is analyzed under the

mixed motive analysis set forth in *Price Waterhouse*. 490 U.S. at 276. "Under *Price Waterhouse*,

when a plaintiff produces evidence that an employer placed substantial reliance on a proscribed

discriminatory factor in making its decision to take the adverse employment action, the burden of

persuasion shifts to the employer to prove that the employment action would have occurred[,]"

even if it had not considered the proscribed factor. *McDevitt v. Bill Good Builders, Inc.*, 816 A.2d

164, 168 (N.J. 2003) (citing *Price Waterhouse*, 490 U.S. at 244-45).

"A plaintiff attempting to prove discrimination by direct evidence faces a 'high hurdle.'"

*Lepore v. Lanvision Sys. Inc.*, 113 F. App'x 449, 452 (3d Cir. 2004) (quoting *Connors v. Chrysler

Fin. Corp.*, 160 F.3d 971, 976 (3d Cir. 1998)). In putting forth a mixed motive claim, a plaintiff

through direct evidence "must demonstrate that the 'decision makers placed substantial negative

reliance on an illegitimate criterion in reaching their decision.'" *Id.* (quoting *Connors*, 160 F.3d at

976). If a plaintiff makes this threshold showing, "the burden of persuasion on the issue of

causation shifts, and the employer must prove that it would have fired the plaintiff even if it had

not considered [the FMLA leave]." *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 598 F. App'x

109, 112 (3d Cir. 2015) (alteration in original) (quoting *Conoshenti v. Pub. Serv. Elec. & Gas Co.*,

364 F.3d 135, 147 (3d Cir. 2004)). "The employer must 'convince the trier of fact that it is more

likely than not that the decision would have been the same absent consideration of the illegitimate

factor.'" *Id. (*quoting *Price Waterhouse*, 490 U.S. at 276) (O'Connor, J., concurring).

Here, MITRE evaluated all of its employees using the "laddering process." (*See* Defs.' SUMF ¶ 22.) All employees, applied company-wide, who received a "3" performance rating were included in the reduction-in-workforce. (*See* Defs.' SUMF ¶¶ 53, 56.) Here, the record indicates that Plaintiff was discharged absent any consideration of his FMLA protected leave. While Plaintiff points to isolated incidences of positive performance comments, he fails to raise a genuine dispute of material fact that supports a discriminatory animus or pre-textual efforts to justify his "3" performance rating in 2012, which is the year MITRE used as the basis for the company-wide RIF and included *all employees that received a "3" rating*. (*See* Defs.' SUMF ¶¶ 44-46, 52-53; Pl.'s CSUMF ¶¶ 29-34) (emphasis added).

The Court, therefore, finds that there is no genuine dispute of material fact regarding the proposition that MITRE would have discharged Plaintiff for reasons not related to the FMLA leave. Accordingly, the Court grants Defendants' Motion for Summary Judgment as to Count Six – Mixed Motive. Notwithstanding the Court's determination that there is no dispute of fact in the record that supports Plaintiff's argument that his termination was the result of a mixed motive, the Court now turns to the FMLA claims presented in Counts Six – Entitlement, Seven, and Eight.

2.     Violation of FMLA (Count Six – Entitlement)

Pursuant to the FMLA, an employee is entitled to return from qualified leave to his position, or to an equivalent position. *Conoshenti*, 364 F.3d at 141 (citing 29 U.S.C. § 2614(a)(1)). This entitlement to restoration, however, is qualified under the statute. *Wolpert*, 817 F. Supp. 2d at 438. The FMLA "does not entitle a restored employee to a right, benefit or position to which the employee would not 'have been entitled had the employee not taken the leave.'" *Id.* (quoting 29 U.S.C. § 2614(a)(3)(B)). Thus, when an employer can demonstrate that "an employee would

29

have been laid off during the FMLA leave period" independent of the employee's FMLA leave, the employee is not entitled to restoration. 29 C.F.R. § 825.216(a)(1). The employer bears the burden to prove that the employee's position would have been eliminated in the RIF. *Wolpert*, 817 F. Supp. 2d at 438; *Parker v. Hanhemann Univ. Hosp.*, 234 F. Supp. 2d 478, 487 (D.N.J. 2002). In other words, to defeat Plaintiff's entitlement claim, Defendants need only demonstrate the absence of a dispute of material fact that Plaintiff would have been terminated in the RIF even if he were not on disability leave.

Here, Plaintiff was on leave pursuant to FMLA at the time he was informed about the RIF. (*See* Defs.' SUMF ¶ 55.) MITRE's decision to implement the RIF was made in March and April 2013 and was based on MITRE's concern that a federal government funding sequestration would occur. (*See Id.* ¶¶ 50-53.) By March 25, 2013, the RIF list was finalized. (*See Id.* ¶ 54.) As the record indicates, Plaintiff's selection for termination was based upon the 2012 performance evaluation, which applied equally to employees not on leave who had similar performance evaluation ratings as Plaintiff. (*See Id.* ¶ 56.) In addition, the record indicates that the 2012 performance rating was completed by Jensen, Plaintiff's supervisor, before he had knowledge of the RIF. (*See Id.* ¶ 54.) The Court finds that Defendants have demonstrated the absence of a dispute of material fact that Plaintiff would have been terminated in the RIF, even if he were not on FMLA leave. The Court, therefore, grants Defendants' Motion for Summary Judgment as to Count Six – Entitlement.

### 3.    Violation of FMLA (Count Seven – Interference)

Count Seven alleges "interference" with Plaintiff's FMLA rights in violation of 29 U.S.C. § 2615(a)(1). To prevail on an interference claim, Plaintiff must show that: (1) he was entitled to take FMLA leave on April 18, 2013; and (2) Defendants denied Plaintiff's right to do so.

*Lichtenstein*, 598 F. App'x at 113 (citing *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 312 (3d Cir. 2012)). To that end, "for an interference claim to be viable, the plaintiff must show that FMLA benefits were actually withheld." *Id.* (quoting *Ross v. Gilhuly*, 755 F.3d 185, 192 (3d Cir. 2014)). Here, Plaintiff was entitled to and went on approved FMLA leave on April 12, 2013. (*See* FMLA Request & Approval, Ex. 22, ECF No. 18-25; Defs.' SUMF ¶ 55.) Plaintiff, therefore, is unable to demonstrate that MITRE denied Plaintiff the right to take leave. *See Lichtenstein*, 598 F. App'x at 113. The Court concludes that Plaintiff fails to carry his burden of proof on his FMLA interference claim and grants Defendants' Motion as to Count Seven.

### 4. Violation of FMLA (Count Eight – Retaliation)

Count Eight alleges "retaliation" in violation of 29 U.S.C. § 2615(a)(2). The FMLA "protects employees from suffering discrimination because they have exercised their rights under the FMLA." *Parker*, 234 F. Supp. 2d at 487-88 (citation omitted). For claims asserted under the retaliation theory, the Court applies the same *McDonnell Douglas* burden-shifting framework as it does to discrimination claims. *Lepore*, 113 F. App'x at 453. To establish a prima facie retaliation claim, Plaintiff must point to a dispute of fact that: (1) he exercised his rights under the FMLA; (2) he was subject to an adverse employment decision; and (3) the adverse decision was causally related to his leave. *Id.* (citing *Conoshenti*, 364 F.3d at 146).

There is no dispute that Plaintiff took FMLA leave from April 12, 2013 to April 20, 2013 and suffered an adverse employment decision, as Plaintiff was terminated as a part of the RIF that was implemented on April 17, 2013. (*See* FMLA Request & Approval, Ex. 22; Defs.' SUMF ¶¶ 55-56.) At issue in Count Eight, accordingly, is whether there is a genuine dispute of material fact that there was a causal connection between the leave and Plaintiff's termination.

Here, Plaintiff does not meet his prima facie burden because he is unable to establish the causal relationship between his FMLA leave and his subsequent termination. "With respect to the causation prong, [the Court] consider[s] whether a reasonable jury could link the employer's conduct to retaliatory animus." *Hare v. Potter*, 220 F. App'x 120, 128 (3d Cir. 2007). In the Court's assessment, it "may consider the 'temporal proximity' between the plaintiff's protected activity and the employer's allegedly retaliatory response, and 'the existence of a pattern of antagonism in the intervening period.'" *Id.* (quoting *Jensen v. Potter*, 435 F.3d 444, 449 n.2 (3d Cir. 2006)). In other words, "[c]ourts have observed two primary factors in determining causality: timing and a pattern of antagonism." *Ellison v. B.J.'s, Inc.*, No. 06-4977, 2007 WL 3395831, at *11 (D.N.J. Nov. 8, 2007) (citing *Hare*, 220 F. App'x at 128). Courts, however, are obliged to allow "a plaintiff to substantiate a causal connection for purposes of the prima facie case through other types of circumstantial evidence that support the inference." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280-81 (3d Cir. 2000). Given this consideration, the record evidence precludes a reasonable factfinder from concluding that there is a causal nexus between the FMLA leave and Plaintiff's termination. *See Hare*, 220 F. App'x at 128.

Here, MITRE contends that Plaintiff was discharged due to the RIF, which included all employees, company-wide, that received a "3" rating on their 2012 annual performance evaluations. (Defs.' SUMF ¶¶ 50-56.) Plaintiff's employment was terminated while he was on FMLA leave, but Plaintiff came into work because he heard about the RIF from a colleague. (*See* Defs.' SUMF ¶ 55; Pl.'s CSUMF ¶ 57.) Plaintiff's termination was made in response to Plaintiff's "3" ratings on his 2012 performance evaluation and a company-wide RIF. (*See* Defs.' SUMF ¶ 53; Pl.'s CSUMF ¶ 55.) Therefore, even though it is undisputed that Plaintiff was entitled to FMLA, "he certainly was not immunized from adverse employment decisions unrelated to his protected

32

activity." *Ellison*, 2007 WL 3395831, at \*11 (citing 29 C.F.R. § 825.216; *Holpp v. Integrated Commc'ns Corp.*, 214 F. App'x 176, 178 (3d Cir. 2007)). Plaintiff does not reference evidence of record from which a rational factfinder could reasonably conclude that Plaintiff's termination was causally related to his FMLA leave.[4] The Court, accordingly, grants Defendants' Motion as to Count Eight.

### D.    Contract Claims (Counts Nine, Ten, Eleven)[5]

Under New Jersey law, to state a claim for breach of contract, a plaintiff must allege: "(1) a contract between the parties; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that the party stating the claim performed its own contractual obligations." *Frederico v. Home Depot*, 507 F.3d 188, 205 (3d Cir. 2007). In New Jersey, every "contract contains an implied covenant of good faith and faith dealing." *Sons of Thunder, Inc. v. Borden, Inc.*, 690 A.2d 575, 587 (N.J. 1997). The New Jersey Supreme Court has found that "[i]n every contract there is an implied covenant that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract[.]'" *Id.* (quoting *Palisades Props., Inc. v. Brunetti*, 207 A.2d 522, 531 (N.J. 1965)) (alteration in original). Conversely, "[i]n the absence of a contract there is no implied obligation of good faith and fair dealing." *DeJoy v. Comcast Cable Commc'ns, Inc.*, 968 F. Supp. 963, 989 (D.N.J. 1997) (citing *Varrallo v. Hammond, Inc.*, 94 F.3d 842, 848 (3d Cir. 1996)). "In the Third Circuit and in New Jersey, there

---

[4] To the extent Plaintiff argues that the performance rating was driven by discriminatory animus and the alleged discriminatory-based performance rating and termination are causally related to Plaintiff's FMLA leave, the Court finds this argument unpersuasive. Further, to the extent Plaintiff alleges retaliation claims related to FMLA leave taken in 2010, the Court finds those claims to be barred by the statute of limitations. *See* 29 U.S.C. § 2617(c)(1).

[5] With respect to Counts Nine, Ten, and Eleven, Plaintiff does not oppose Defendants' Motion for Summary Judgment and fails to brief these Counts in his summary judgment opposition brief. (*See* Pl.'s Opp'n Br. 2 n.1.) The Court nevertheless addresses the claims.

is a strong presumption that all employment relationships are terminable at-will by either party unless otherwise specified." *Renart v. Chartwells*, No. 01-1478, 2003 WL 22454931, at *3 (D.N.J. Oct. 6, 2003) (citing *Varrallo*, 94 F.3d at 845). New Jersey recognizes "certain circumstances in which an at-will presumption can be overcome." *Id*

Here, there was no employment contract between the parties, and Plaintiff failed to demonstrate any circumstance that would overcome the at-will presumption. (*See* Defs.' SUMF ¶ 6; Pl.'s Dep. 46:5-11, Ex. 4, ECF No. 18-7.) Based on the undisputed material facts, the Court concludes that no reasonable trier of fact could find that Plaintiff established prima facie claims for Counts Nine, Ten, and Eleven. The Court, therefore, grants Defendants' Motion as to these Counts.

## V.   **CONCLUSION**

For the reasons set forth above, Defendants' Motion for Summary Judgment is granted. An order consistent with this Memorandum Opinion will be entered.

**MICHAEL A. SHIPP**
**UNITED STATES DISTRICT JUDGE**

**Dated:** March 30, 2017